IN THE UNITES STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | |
| | ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WALGREEN CO., | ) | |
| | ) | |
| Defendant. | ) | |

<u>COMPLAINT OF THE UNITED STATES OF AMERICA
AND THE COMMONWEALTH OF VIRGINIA</u>

The United States and the Commonwealth of Virginia ("the Commonwealth") (collectively, "the Government") bring this action against Defendant Walgreen Co. ("Walgreens" or "Defendant") to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, the Virginia Fraud Against Taxpayers Act ("VFATA"), VA. CODE ANN. § 8.01-216.1 *et seq*., the Virginia Medicaid Fraud Statute, VA. CODE ANN. § 32.1-312, and the common law remedies of unjust enrichment, payment by mistake, and common law fraud for engaging in a scheme from January 2015 to July 2016, to submit false claims for prescription drugs used in the treatment of hepatitis C (the "Relevant Drugs") to the Virginia Department of Medical Assistance Services ("DMAS"), resulting in reimbursement totaling hundreds of thousands of dollars to which Defendant was not entitled and, to which to date, Defendant has not returned.

# I.    JURISDICTION AND VENUE

1.      This action is to redress violations of the FCA, 31 U.S.C. § 3729 *et seq*.  The Court has

personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant transacts

business in this District, and because Defendant submitted or caused to be submitted claims for

payment to the United States and the Commonwealth for prescriptions filled in this District and it

received payments from the United States and the Commonwealth for those prescriptions.

2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

and 1345.

3.      This Court has jurisdiction over the Commonwealth's state law claims pursuant to 31

U.S.C. § 3732(b), because the violations of state and federal law arise from the same transactions

or occurrences, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

4.      Venue lies under 28 U.S.C. §§ 1391(b)-(c) and 1395(a), and 31 U.S.C. § 3732(a), because

the claims arose in the Western District of Virginia and Defendant transacts business in the same.

# II.    PARTIES

5.      The United States, acting through the Department of Health and Human Services ("HHS"),

administers grants to states for Medical Assistance Programs pursuant to Title XIX of the Social

Security Act, 42 U.S.C. §§ 1396 *et seq.* (2018) ("Medicaid").  The United States brings this civil

action on behalf of itself and HHS, an agency of the United States, pursuant to 31 U.S.C. § 3730(a).

6.      The Virginia Attorney General brings this action in the name of the Commonwealth for

damages resulting from false claims submitted or caused to be submitted to DMAS,[1] the agency

that administers the Virginia Medicaid Program.

---

[1] DMAS is the agency that administers the Virginia Medicaid Program for the Commonwealth.
For purposes of this Complaint, the term DMAS includes, and is interchangeable with, the

7.      Defendant Walgreens is a Delaware corporation with its principal place of business at 108 Wilmot Road, Deerfield, Illinois, 60015.[2]  Walgreens owns and operates approximately 9,021 stores throughout the United States and is one of the world's largest purchasers of prescription drugs.[3]

8.      Walgreens was a registered Virginia Medicaid provider during the relevant time period of the conduct alleged herein.  Specifically, the Walgreens Specialty Pharmacy located in the Holston Valley Medical Center at 130 West Ravine Road, #101, Kingsport, Tennessee 37760 ("Walgreens Store # 13980") billed DMAS for services under National Provider Identification Number 1245542737.

### III.      APPLICABLE LAW AND THE VIRGINIA MEDICAID PROGRAM

9.      The Medicaid program is a jointly funded federal and state program that provides health care coverage to eligible individuals.  42 U.S.C. § 1396a(a)(10)(A)(i).

10.      Before receiving any federal Medicaid funds, participating states must submit a "state plan for medical assistance" to the Secretary of HHS, as required by Section 1902 of Title XIX of the Social Security Act.  42 U.S.C. § 1396a.  This plan describes how a state will administer its Medicaid program and guarantees that the state will meet the applicable federal rules and regulations related to Medicaid, a requirement for federal funding.

11.      The Commonwealth is a Medicaid participating state and Virginia law authorizes DMAS to administer the Virginia Medicaid program.  VA. CODE ANN. § 32.1-325.  DMAS is the single state agency designated by the General Assembly of Virginia, under the provision of Title XIX of

---

Virginia Medicaid Program and any contractors or Managed Care Organizations ("MCO") engaged by, or working on behalf of, DMAS or the Virginia Medicaid Program.
[2] Walgreens Co., Annual Report (Form 10-K) (October 15, 2020) *available at* https://sec.report/Document/0001618921-20-000082.
[3] *Id*.

the Social Security Act, to administer the Medicaid Program on a statewide basis in accordance with the requirements of 42 C.F.R. § 431.50. *See* 12 VA. ADMIN. CODE §§ 30-10-10 *et seq*.; *id.* at 30-10-30.

12.     DMAS provides Medicaid services through fee-for-service ("FFS") and MCO programs.

13.     At all times relevant to this Complaint, DMAS contracted with Magellan Medicaid Administration ("Magellan") to administer its FFS claims.    Magellan had numerous responsibilities, one of which was to determine whether patients who sought payment coverage from DMAS for expensive prescription drugs satisfied DMAS' coverage eligibility criteria. DMAS directly reimburses the provider for services provided to FFS recipients.

14.     DMAS contracts with MCOs to deliver prescription drug and other services to eligible Virginia Medicaid Program recipients.    Providers of prescription drugs who are enrolled in managed care plans receive payment from the MCOs directly.    DMAS pays MCOs for each enrolled Virginia Medicaid Program recipient on a capitated (a fixed monthly fee per recipient) basis from Virginia Medicaid Program funds DMAS receives from the United States and the Commonwealth.    Each MCO then contracts with providers of prescription drugs and the MCO pays for claims for prescription drugs from these providers with funds provided by DMAS pursuant to each MCO's contract with DMAS.

15.     At all times relevant to this Complaint, DMAS contracted with two MCOs to provide the Relevant Drugs for the relevant Virginia Medicaid recipients: Virginia Premier Health Plan, Inc. ("Virginia Premier") and Aetna Better Health of Virginia ("Aetna").[4]

---

[4] In May 2013, Aetna completed its acquisition of Coventry Health Care, Inc., and contracted with DMAS under the name CoventryCares.  On April 1, 2016, Aetna changed its name from CoventryCares to Aetna Better Health of Virginia.

16.     With respect to the prior authorization approval process for certain prescription drugs, during the Relevant Time Period, Virginia Premier contracted with a Pharmacy Benefits Manager ("PBM"), EnvisionRX Options, to complete the initial collection and review of prior authorization documentation.[5]

17.     These MCOs determined whether patients who sought payment coverage from DMAS for the Relevant Drugs satisfied DMAS' coverage eligibility criteria.

18.     Commonwealth regulations do not distinguish between recipients who receive benefits through the FFS program and the managed care program.  Both FFS and managed care recipients are Virginia Medicaid Program members and their benefits are paid through funds provided by the United States and the Commonwealth through the Virginia Medicaid Program.  Consequently, payment for services comes from the Virginia Medicaid Program regardless of whether a provider bills DMAS directly or submits claims through a contracted MCO.

A.     <u>Virginia Medicaid Provider Enrollment Requirements</u>

19.     A provider must execute a participation agreement with DMAS in order to enroll in the Virginia Medicaid program.  By executing a participation agreement, a provider agrees to adhere to the policies and regulations contained in the DMAS Provider Manual(s)[6] pertaining to the specific service(s) it will provide, including documentation requirements and rules for billing DMAS.  Moreover, a provider agrees to comply with all applicable state and federal laws, including state and federal repayment statutes.

---

[5] EnvisionRX Options has since changed its name to Elixir Rx Solutions, LLC.
[6] Provider Manuals are official publications of DMAS and their contents are incorporated by reference into participation agreements signed by providers enrolled in the Medicaid Program. DMAS periodically revises and updates Provider Manuals.

20.     Walgreens Store # 13980 has been a Virginia Medicaid provider since approximately 2010.  Walgreens Store # 13980 entered into a participation agreement with DMAS on or about October 21, 2010.  A copy is attached hereto as Exhibit 1.

## IV.     THE FALSE CLAIMS ACT, THE VIRGINIA FRAUD AGAINS TAXPAYERS ACT, AND THE VIRGINIA MEDICAID FRAUD STATUTE

21.     The FCA, 31 U.S.C. §§ 3729 *et seq*., imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[7]   The FCA also prohibits any person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. at (a)(1)(B).

22.     Under the FCA, the term "knowing" is defined to include reckless disregard and deliberate indifference to the truth or falsity of information.  *Id*. § 3729(b)(1).  The term "obligation," under the statute, includes the "retention of any overpayment."  *Id*. § 3729(b)(3).

23.     As amended by Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), an overpayment is defined as "any funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter."  42 U.S.C. § 1320a-7k(d)(4)(B).  The "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified."  *Id*. § 1320a-7k(d)(2).

24.     Failure to return any overpayment constitutes a reverse false claim actionable under section 3729(a)(1)(G) of the FCA.

---

[7] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009.

25.     The VFATA, VA. CODE ANN. §§ 8.01-216.1 *et seq.*, is modeled after and closely mirrors the language of the FCA.  It was enacted on January 1, 2003.  Similar to the FCA, the VFATA broadly covers all types of fraud occurring on the Commonwealth, including fraud on the Virginia Medicaid program.   Like the FCA, the VFATA imposes civil liability on any person who knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval. VA. CODE ANN. § 8.01-216.3(A) (2020).  The VFATA prohibits a person from knowingly making, using, or causing to be made or used, a false record or material statement, for payment or approval. *Id*. at (A)(2) (2020).   The VFATA also prohibits a person from knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Commonwealth. *Id*. at (A)(8) (2020).

26.     Under the VFATA, the term "knowing" is defined to include reckless disregard and deliberate indifference to the truth or falsity of information and requires no specific intent to defraud.  *Id*. § 8.01-216.3(C) (2020).

27.     Under both the FCA and the VFATA, a claim includes any request for money or payment when the United States or the Commonwealth provides any portion of the funds or reimburses any portion of the money that is requested.  31 U.S.C. § 3729(b)(2)(A) (2009); VA CODE ANN. § 8.01-216.2 (2011).

28.     For FCA violations, the statute provides for treble damages and civil penalties.  31 U.S.C. § 3729(a)(1) (2009).   Similarly, the VFATA provides for treble damages in addition to civil penalties.  VA. CODE ANN. § 8.01-216.3(A) (2020).

29.     The Virginia Medicaid Fraud Statute prohibits any person, agency, or institution from using willful false statements, willful misrepresentations, willful concealment of material facts, or any other fraudulent scheme or device to obtain or attempt to obtain any medical assistance benefits or payments in a greater amount than that to which the person is entitled when the Commonwealth directly or indirectly provides any medical assistance benefits or payments.  VA. CODE ANN. § 32.1-312 (2010).

30.     Any person, agency, or institution that violates this statute is liable to the Commonwealth for the amount of any excess benefits or payments, plus interest and civil penalties, not to exceed three times the amount of the excess benefits or payments.  VA. CODE ANN. § 32.1-312(B) (2010).

## V.     FRAUDULENT SCHEME

31.     From at least as early as January 2015 until at least July 2016, Walgreens engaged in a scheme to obtain health care benefit payments from the Virginia Medicaid Program to which it was not entitled, by submitting or causing to be submitted false and/or fraudulent claims to DMAS and by failing to take steps to repay overpayments after Walgreens identified these claims.

32.     Under Virginia law, DMAS has "the authority to require the submission of any other medical documentation or information as may be required to complete a decision for … coverage for services," including "service authorization decisions performed by the DMAS staff or the DMAS-designated service authorization contractor."  12VAC30-120-1730(B).

33.     During certain time periods, as described below, DMAS required prior authorization (also known as service authorization) before a patient could be prescribed certain prescription drugs. The prior authorization process determined whether the patient satisfied the coverage eligibility criteria to obtain the prescription drug.  The prior authorization was required to be completed by the prescribing practitioner on behalf of an individual patient.  The prior authorization form (i)

8

provided the patient's name, date of birth, and prescriber's identifying information; (ii) answered numerous and detailed questions about the patient's medical history; and (iii) submitted medical lab reports and drug test results supporting the answers to questions about the patient's medical history.  DMAS maintains the submitted prior authorization forms.

34.     After receiving a prior authorization form, DMAS evaluated the answers and supporting medical lab reports to determine if the referenced patient satisfied the eligibility criteria.  If so, DMAS notified the prescriber that coverage would be provided.  If not, DMAS notified the prescriber that coverage would not be provided and included a brief description of the basis for denying coverage.

35.     DMAS did not require that prescribers complete and submit a prior authorization request for all prescriptions; but, during the time periods described below, DMAS required prescribers to complete and submit a prior authorization request for the Relevant Drugs used in the treatment of hepatitis C: Sovaldi 400 MG tablets (NDC Number 61958150101), Harvoni 90MG-400MG tablets (NDC Number 61958180101), and Daklinza 60 MG tablets (NDC Number 00003021501).

36.     Magellan, DMAS' contractor for FFS recipients, required prior authorizations for Medicaid FFS recipients as follows: (1) a prior authorization was required for Sovaldi 400MG tablets as of July 1, 2014; (2) a prior authorization was required for Harvoni 90MG-400MG tablets as of January 1, 2015; and (3) a prior authorization was required for Daklinza 60MG tablets as of January 1, 2016.

37.     Aetna, one of the MCOs that contracted with DMAS to provide prescription drugs to eligible Virginia Medicaid recipients, required prior authorizations as follows: (1) a prior authorization was required for Sovaldi 400MG tablets as of December 7, 2013; (2) a prior

authorization was required for Harvoni 90MG-400MG tablets as of October 10, 2014; and (3) a prior authorization was required for Daklinza 60MG tablets as of July 25, 2015.

38.     Virginia Premier, the other MCO that contracted with DMAS to provide prescription drugs to eligible Virginia Medicaid recipients, required service authorizations as follows: (1) a prior authorization was required for Sovaldi 400MG tablets as of December 2013; a prior authorization was required for Harvoni 90MG-400MG tablets as of October 2014; and (3) a prior authorization was required for Daklinza 60MG tablets as of July 2015.

39.     Absent approval of a prior authorization request, claims for the Relevant Drugs would be denied.

40.     The Relevant Drugs were prescription drugs used to treat hepatitis C infections.  These drugs were extremely expensive.  For example, during the relevant time period, DMAS paid over $32,000 for a single 28-day supply of Harvoni 90MG-400MG tablets.  Patients often required as many as two additional refill prescriptions to complete the full course of treatment.

41.     DMAS specified that a Virginia Medicaid patient with hepatitis C would be eligible for payment coverage for the Relevant Drugs only if the patient satisfied certain medical eligibility criteria.  The criteria were included on the prior authorization request form and, in general, included requirements related to disease severity and absence of use of illicit drugs and/or alcohol for a certain period of time.  By means of example, attached hereto as Exhibit 2 is the prior authorization request form that Magellan used during the relevant time period, which sets forth the eligibility requirements for the Relevant Drugs.

42.     In terms of disease severity, the eligibility criteria set forth required parameters for the patient's fibrosis score (greater than or equal to 0.59), as well as the patient's metavir stage, which

is also called a fibrosis stage (F3 or greater).  The recipient could also qualify if the prescriber documented cirrhosis in the patient.

43.     The metavir scoring system and the fibrosis scoring system are used to assess fibrosis or scarring of the liver of patients with hepatitis C and other ailments.

44.     With respect to the requirements related to drug and/or alcohol use, the eligibility criteria required that the patient had not used any illicit substance within the six months prior to obtaining the Relevant Drug.  The prior authorization required the provider to submit evidence that the patient satisfied this criterion in the form of urine drug screen results or physician certification.

45.     Beginning at least as early as January 2015 through at least July 2016, Walgreens knowingly presented, or caused to be presented, false claims for reimbursement to DMAS. Specifically, Walgreens knowingly created falsified records for use in submitting claims for payment to DMAS.  Walgreens then submitted, or caused to be submitted, these false records for at least twelve (12) DMAS enrollees to obtain an authorization for payment for prescription drugs. As a result of the creation and submission of the false documents, DMAS approved prior authorization requests submitted or caused to be submitted by Walgreens and paid Walgreens at least $793,908.95 for the Relevant Drugs.

46.     During all times relevant to the Complaint, Walgreens Store # 13980 utilized the following telephone numbers: (423) 224-6860 and (423) 765-8524.

47.     During all times relevant to the Complaint, Walgreens Store # 13980 utilized the following fax number: (423) 224-5654.

48.     At all times relevant to the false submissions, Amber Reilly ("Reilly") was employed as a clinical pharmacy manager by Walgreens Store # 13980.

49.     At all times relevant to this Complaint, Walgreens paid Reilly a base salary of

approximately $136,000, and an annual bonus of up to $25,000.

50.    Reilly's employment with Walgreens was terminated in June 2016.

51.    Many of the relevant Virginia Medicaid recipients were patients of Physician Group 1, a medical practice located in Kingsport, Tennessee.   In submitting documentation to DMAS, in some instances Reilly held herself out to be a "patient care advisor" with Physician Group 1.  At all times relevant to this Complaint, Reilly was an employee of Walgreens and was not employed by Physician Group 1.

52.    At all times relevant to this Complaint, Reilly was not authorized to sign the name of any employee of Physician Group 1 on any document submitted to DMAS.

53.    Reilly reached out to a Nurse Practitioner at Physician Group 1 ("NP 1") and proactively offered to complete the insurance paperwork for Physician Group 1's hepatitis C patients if Physician Group 1 filled the prescriptions through Walgreens Store # 13980.  NP 1 agreed to allow Reilly to fill out the insurance paperwork, but NP 1 did not give Reilly authority to sign NP 1's name or write any appeal letters on NP 1's behalf without NP 1 reviewing and approving the letter.

A.   Walgreens' Profit from the False Claims Submitted

54.    Walgreens Store # 13980's revenue for February 2015, when Walgreens was first paid by DMAS for a claim based on the submission of false prior authorizations and medical records, was $1,589,528.  In May 2016, Walgreens Store # 13980 earned $5,098,765—an increase of more than 320 percent in just over one year.



55.    This staggering revenue increase resulted from dramatic increases in revenues from payments by government payors, including DMAS, for hepatitis C drugs.

56.    Walgreens, through or at the direction of Reilly, altered patients' records and submitted false documents and claims to DMAS, to Walgreens' financial benefit.  In her performance review for the period September 1, 2014 through August 31, 2015 with her manager, Charles Wykes, Ms. Reilly stated, "I know what each payor requires for approval, [. . .] and I've became [*sic*] an expert in customizing appeal letters based on a plan's criteria.  This knowledge has been crucial in receiving approvals, which in return, has increased profits and strengthened relationships with providers."  Her manager commented "[Reilly] has not only created loyal customers, but has created very loyal Dr offices and case managers and has developed our site to have a reputation of one that will go the extra mile.  She [. . .] must present in a way that gains trust because I have witnessed her detail one day and the next gain several referrals from the office."

B.  Walgreens' Awareness of the Fraudulent Scheme

57.     Walgreens became aware of Reilly's fraud at least as early as June 2016 and was on notice that it had received payments based on false statements and documents submitted or caused to be submitted and that it had an obligation to reimburse DMAS for such overpayments.

58.     On or about June 8, 2016 and June 14, 2016, the Tennessee Bureau of Investigation ("TBI") served Walgreens with subpoenas seeking records related to prescriptions filled for certain patients.

59.     On June 15, 2016, Walgreens' loss prevention personnel went to Walgreens Store # 13980 to investigate and recovered certain records that had been altered.  The loss prevention personnel also spoke to an employee of Walgreens who worked at Reilly's direction, and the employee admitted to falsifying several prior authorization records at Reilly's direction.  This discovery further put Walgreens on notice that it had obtained payments fraudulently and that it had an obligation to reimburse for fraudulently approved claims.

60.     In October 2016, Reilly pleaded guilty to one count of healthcare fraud relating to falsifying documents submitted to government payors.  Specifically, Reilly admitted that, in her role as a clinical pharmacy manager, she falsified (and directed at least one other employee to falsify) prior authorizations, medical lab reports, and drug test results so that otherwise unqualified hepatitis C patients would satisfy eligibility criteria.  *See* Amber Reilly Plea Agreement, attached hereto as Exhibit 3.

61.     A sentencing hearing for Reilly was held on January 30, 2017.  That hearing was continued until June 26, 2017 while the judge took under advisement several objections filed by Reilly in advance of the January 30, 2017 hearing.  On February 21, 2017, Judge James Ronnie Greer issued a Memorandum Opinion and Order regarding Reilly's objections.  *See United States v. Amber Reilly*, 2:16-CR-107 (E.D. Tenn.) Dkt. No. 24.  In this opinion, Judge Greer found that "Walgreens

had a set formula for how its employees were to receive bonuses.  [Reilly's] fraud likely increased her chances of receiving bonuses because it increased the total number of prescriptions filled and because it increased customer satisfaction.  The customers were getting prescriptions filled that they were not entitled to under TennCare.[8]  Both of these are factors included in Walgreens' formula for bonuses."  Memo. Op. and Order at *4.

62.     During the June 2017 sentencing hearing, Judge Greer again recognized that "promotions at work or increased salary or those sorts of things, bonuses" were a motivation for Reilly's actions. Reilly Sent. Tr. 44:19-21, June 26, 2017.  He further stated that, "what [Reilly] might gain through a promotion at work for [her]self" was a motivation.  *Id.* at 35:7-9.

63.     Judge Greer further noted that "Walgreens may be required to reimburse the state" related to Reilly's submission of false claims.  *Id.* at 44:22-23.

64.     More than four and a half years have passed since Reilly's guilty plea for falsifying records and submitting false claims, yet Walgreens has made no attempt to refund the payments to DMAS as required by DMAS' Pharmacy Manual, which requires providers to "refund payments made by Medicaid if they are found to have billed Medicaid contrary to law or regulation, failed to maintain any record or adequate documentation to support their claims, or billed for medically unnecessary services."[9]

C.   The Virginia Medicaid Recipients

65.     Walgreens submitted or caused to be submitted false statements to DMAS for no fewer than twelve (12) Virginia Medicaid recipients, resulting in the Virginia Medicaid program paying

---

[8] TennCare is the name of the Medicaid program for the State of Tennessee.
[9] DMAS Pharmacy Policy Manual, Chapter VI at p. 2 (last updated Dec. 16, 2015), *available at* https://www.ecm.virginiamedicaid.dmas.virginia.gov/WorkplaceXT/getContent?impersonate=true&id={B6B7A273 -E65D-4CA0-AFF5-0581CCPatient 2ED22}&vsId={997BD5C1-A834-45EF-8B10- 269B0F18DA94}&objectType=document&objectStoreName=VAPRODOS1.

Walgreens at least $793,908.95 for prescriptions drugs that the recipients were not qualified to receive.

*Patient 1*

66.     Patient 1 was a Virginia Medicaid recipient who received Sovaldi 400 MG tablets on May 4, 2016, May 26, 2016, and June 30, 2016.  Because Patient 1 was a FFS recipient, a prior authorization was required to be submitted to Magellan prior to the prescriptions being reimbursed from government funds.

67.     At all times relevant to this Complaint, Patient 1 was treated for hepatitis C by MD 1, a physician with Physician Group 1.

68.     On April 25, 2016, MD 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 1.  A copy of that Prescription/Pharmacy Intake Form is attached hereto as Exhibit 4.[10]

69.     On April 26, 2016, Walgreens responded and informed Physician Group 1 that "we [Walgreens] will work on [Patient 1's] prior authorization."

70.     Also on April 26, 2016, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 1 for Sovaldi 400 MG tablets.  The prior authorization form is attached hereto as Exhibit 5.  The prior authorization form attests that Patient 1's fibrosis score is greater than or equal to 0.59.

71.     The prior authorization request form purports to be signed by MD 1.  However, this signature does not match MD 1's signature on the Prescription/Pharmacy intake form and MD 1 has confirmed that they did not sign the prior authorization form.

---

[10] In order to protect the personal health information of the Virginia Medicaid recipients involved the Walgreens' false submissions, the Complaint does not include as exhibits all of the documents referenced in the Complaint. However, the documents relevant to the false claims submitted or caused to be submitted by Walgreens for Patient 1 are included in redacted form in order to provide an illustrative example of the fraud.

72.     On April 27, 2016 and April 28, 2016, DMAS responded to the prior authorization request and stated that additional information was required to substantiate Patient 1's disease severity, as well as her abstention from alcohol and illicit drugs for the required time period.

73.     In response to DMAS' request for additional supporting evidence, Walgreens submitted or caused to be submitted to DMAS a false report for lab work completed at Solstas Labs with a collection date of March 3, 2016.  In the report, the fibrosis score is smudged and a handwritten fibrosis score of 0.62 is added.  The lab report also lists Patient 1's fibrosis stage as F3.  The "Notes" section of the report, states: "fibrosis."  The false lab report, as maintained by DMAS, is attached hereto as Exhibit 6.

74.     As of at least August 3, 2016, Walgreens had in its possession the actual lab report for Patient 1 from March 3, 2016, in which the fibrosis score is 0.42 and the fibrosis stage is F1-F2.  The "Notes" section of the report states: "minimal fibrosis."  The actual lab report, as maintained by Walgreens, is attached hereto as Exhibit 7.  The actual lab report, as maintained by Solstas Labs, is attached hereto as Exhibit 8.

75.     As of August 2016, Walgreens had collected accurate records for Patient 1 from Physician Group 1.  The collected records did not contain any lab reports or test results evidencing disease severity that would satisfy the requirements necessary to obtain prior authorization for Sovaldi.

76.     Based on records in Walgreens' possession as of August 2016, Walgreens was aware or should have been aware that the lab report evidencing disease severity that Walgreens submitted or caused to be submitted to DMAS was not included in the patient records for Patient 1 maintained by Physician Group 1.

77.     On May 4, 2016, relying on the false claims submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 1.

78.     The false information on Patient 1's fibrosis score on the prior authorization request was a material false statement, as was the forged fibrosis score, the forged fibrosis stage, and the alteration of the Note from "minimal fibrosis" to "fibrosis" on the lab report discussed above.

79.     The claims would not have been paid absent the submission of these material false statements.

80.     Virginia Medicaid paid Walgreens a total of $87,593.70 for Sovaldi 400 MG tablets for Patient 1.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 2*

81.     Patient 2 was a Virginia Medicaid recipient who received Daklinza 60 MG tablets on February 9, 2016, March 10, 2016, and April 6, 2016.  Patient 2 also received Sovaldi 400 MG tablets on February 9, 2016.  A prior authorization was required to be submitted to Magellan for the February 9, 2016 Sovaldi 400 MG tablet claim and Daklinza 60 MG tablet claim.  A prior authorization was required to be submitted to Virginia Premier for the March 10, 2016 and April 6, 2016 Daklinza 60 MG tablets claims prior to the prescriptions being reimbursed from government funds.

82.     At all times relevant to this Complaint, Patient 2 was treated for hepatitis C by MD 2 at Physician Group 1.

83.     On February 2, 2016, MD 2 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 2.

84.     On February 5, 2016, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 2 for Daklinza 60 MG tablets and Sovaldi 400 MG tablets. The prior authorization request attests that Patient 2 has a metavir score of F3-F4 and a fibrosis score of greater than or equal to 0.59.

85.     The prior authorization contains a handwritten note stating: "patient started on Peg/Ribavirin in 2011 [and] had to stop due to reaction to Ribavirn."  MD 2 did not write this note, nor did they instruct or allow Walgreens to include this information on the prior authorization request.

86.     The prior authorization form is purported to be signed by MD 2.  However, this signature does not match MD 2's signature on the Prescription/Pharmacy intake form and MD 2 has confirmed that they did not sign the prior authorization form.

87.     On February 8, 2016, DMAS responded to the prior authorization request and stated that additional information was required to substantiate Patient 2's disease severity, as well as her abstention from alcohol and illicit drugs for the previous six months.

88.     In response to the request for additional information, Walgreens submitted or caused to be submitted to DMAS a lab report that purported to be from Takoma Medical Associates with a collection date of January 27, 2016.

89.     The name, gender, date of birth, and treating provider on the Takoma Medical Associates' lab report were falsified.  Patient 2's patient information was substituted onto the report of another, unknown individual.   The altered report included a handwritten fibrosis score of 0.68 and a handwritten metavir score of F3.

90.     Based on DMAS' billing records, Patient 2 was never treated at Takoma Medical Associates.

91.     Patient 2's patient file maintained by Physician Group 1 does not contain any record of any lab work being done for Patient 2 at Takoma Medical Associates.

92.     Walgreens also submitted or caused to be submitted to DMAS an additional report purportedly from Solstas Labs dated January 21, 2016 to support the prior authorization request.

This report was altered to add Patient 2's name and date of birth to the bottom of a Hepatitis Acute Panel results report for a different, unknown individual.

93.     Based on DMAS' billing records, Solstas Labs did not bill DMAS for performing any lab test for Patient 2 in January 2016.

94.     A subpoena to Solstas Labs further confirmed that Solstas Labs did not perform any lab work on Patient 2 in January 2016.  Solstas Labs did perform a Hepatitis Acute Panel for Patient 2 in August 2015 and the results were not consistent with the January 21, 2016 report discussed above.

95.     Additionally, Walgreens submitted or caused to be submitted the results of a CT Abdomen Without and With Contrast dated December 2015.  This report contains no information to identify the individual for which the testing was done, nor does it contain any information on the facility at which the procedure was performed, except the name of the physician that signed the report. The findings section of the report states that the liver is "markedly cirrhotic in appearance" and the impressions section of the report states that there are "significantly cirrhotic changes of the liver noted."  This is a report for another, unknown individual and not for Patient 2.

96.     Based on DMAS' billing records, DMAS has never been billed by any entity for performing a CT Abdomen on Patient 2 in December 2015.

97.     Patient 2's patient file maintained by Physician Group 1 does not contain any record of a CT Abdomen procedure.

98.     On February 9, 2016, relying on the false claims submitted or caused to be submitted by Walgreens, DMAS approved the prior authorizations for Patient 2.  On the same day, Walgreens informed Physician Group 1 that the prior authorizations had been approved.

99.     The false information on Patient 2's fibrosis score and metavir score on the prior authorization request were material false statements, as were the alterations on the lab reports described above.

100.    The claims would not have been paid absent the submission of these material false statements.

101.    Virginia Medicaid paid Walgreens a total of $93,865.60 for Daklinza 60MG tablets and Sovaldi 400 MG tablets for Patient 2.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 3*

102.    Patient 3 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on June 11, 2015 and July 9, 2015.  Because Patient 3's coverage was provided through Virginia Premier, a prior authorization was required to be submitted to Virginia Premier prior to the prescriptions being reimbursed from government funds.

103.    At all times relevant to this Complaint, Patient 3 was a treated for hepatitis C by NP 1, who, at the time, was a nurse practitioner at Physician Group 1.

104.    On May 13, 2015, NP 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 3.

105.    On May 18, 2015, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 3 for Harvoni 90MG-400MG tablets.  The request attested that Patient 3 had a Metavir score of F3 and had abstained from the use of alcohol and illicit drugs for the required time period.

106.    The prior authorization form is purported to be signed by NP 1.  However, this signature does not match NP 1's signature on the Prescription/Pharmacy intake form and NP 1 has confirmed that they did not sign the prior authorization form.

107.    On May 19, 2015, Virginia Premier denied the prior authorization request because the request did not meet the requirements regarding evidence of negative urine drug screens.  The denial is addressed to NP 1, but the fax number and phone number on the notice of denial were for Walgreens Store # 13890.

108.    After the prior authorization was denied, Walgreens submitted or caused to be submitted an appeal letter to Virginia Premier on behalf of Patient 3.  The letter identified the author as a "patient care advisor" to NP 1 and stated that Patient 3 had a metavir score of F3 and had abstained from the use of illicit drugs and alcohol, as shown in the attached urine drug screen reports.  The letter was not written by NP 1 and NP 1 did not authorize any other individual to write and/or submit this letter.

109.    In filing his appeal of Virginia Premier's denial, Patient 3 identified Reilly as his "case manager" and attested that Reilly was the individual who informed him of the denial.

110.    In support of the appeal, Walgreens submitted or caused to be submitted to DMAS a urine drug screen report purportedly conducted at Takoma Regional Hospital for Patient 3 with a collection date of April 30, 2015.  The report purportedly evidenced that Patient 3 received a negative result for all drugs included in the test.

111.    The April 30, 2015 lab report submitted or caused to be submitted by Walgreens was falsified.  Walgreens substituted Patient 3's name on the report for another, unknown individual.  This can be seen in the fact that the font for the patient name is not consistent with the font in the remainder of the form.

112.    Based on DMAS' billing records, Takoma Regional Hospital never billed DMAS for performing lab work on Patient 3 during the April 2015 to May 2015 time period.

113.    Patient 3's patient file maintained by Physician Group 1 does not contain any record of any lab work being done at Takoma Regional Hospital.

114.    Also in support of the appeal, Walgreens submitted or caused to be submitted a falsified lab report for Patient 3 with a collection date in December 2014 showing a fibrosis score of 0.74 and fibrosis stage of F3 – F4.  In the falsified report, Patient 3's name is substituted over the name of another, unknown individual, as evidenced by the fact that while the report is blurred and partially illegible, the patient name is clear and in a font that is not consistent with the font on the remainder of the report.

115.    Based on DMAS' billing records, no entity billed DMAS for any lab work for Patient 3 during the December 2014 time period.

116.    Patient 3's patient file maintained by Physician Group 1 does not contain the falsified lab report from December 2014.

117.    On June 10, 2015, relying on the falsified documentation submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 3.

118.    The false information on Patient 3's Metavir score on the prior authorization request was a material false statement, as were the false urine drug screen, false fibrosis score, and false fibrosis stage on the lab reports discussed above.

119.    As of August 2016, Walgreens had collected accurate records for Patient 3 from Physician Group 1.  The collected records did not contain any lab reports or test results evidencing disease severity that would satisfy the requirements necessary to obtain prior authorization for Harvoni.

120.    Based on records in Walgreens' possession as of August 2016, Walgreens was aware that the lab reports evidencing disease severity that Walgreens submitted or caused to be submitted to DMAS were not included in the patient records for Patient 3 maintained by Physician Group 1.

121.    Walgreens is in possession of all prior authorization submission and appeals documentation, including the falsified lab reports referenced above.

122.    The claims would not have been paid absent the submission of these material false statements.

123.    Virginia Medicaid paid Walgreens a total of $64,149.10 for Harvoni 90MG-400MG tablets for Patient 3.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 4*

124.    Patient 4 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on July 17, 2015.  Because Patient 4 was a FFS recipient, a prior authorization was required to be submitted to Magellan prior to the prescription being reimbursed from government funds.

125.    At all times relevant to this Complaint, Patient 4 was treated for hepatitis C by MD 2 at Physician Group 1.

126.    In July 2015, MD 2 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 4.

127.    On July 14, 2015, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 4 for Harvoni 90MG-400MG tablets.  The prior authorization request attested that Patient 4 had a metavir score of F3-F4 and a fibrosis score of greater than or equal to 0.59.

128.   The prior authorization form is purported to be signed by MD 2.  However, this signature does not match MD 2's signature on the Prescription/Pharmacy intake form and MD 2 has confirmed that they did not sign the prior authorization form.

129.   In support of the prior authorization request, Walgreens submitted or caused to be submitted a lab report purportedly from Quest Diagnostics with a collection date of June 2, 2015. The testing was purportedly performed at Takoma Medical Associates.  The report evidences Patient 4's fibrosis score as 0.61 and metavir score as F3.  This report was falsified.  Patient 4's name was substituted onto the lab report for a different, unknown individual.

130.   Based on DMAS' billing records, neither Takoma Medical Associates nor Quest Diagnostics billed DMAS for lab testing for Patient 4 in June 2015.

131.   Patient 4's patient file maintained by Physician Group 1 does not contain any record of any lab work being done at Takoma Medical Associates.

132.   On July 15, 2015, DMAS requested additional evidence that Patient 4 had abstained from the use of alcohol and illicit drugs during the relevant time period.

133.   In response, Walgreens submitted or caused to be submitted the results of a urine drug screen with a collection date of April 27, 2015, showing no detection for all substances tested. This report does not include information on the company that collected and analyzed the sample. Patient 4's name and date of birth were substituted on the top of a lab report for a different, unknown individual.

134.   Based on DMAS' billing records, no entity billed DMAS for a urine drug screen for Patient 4 performed in April or May 2015.

135.   Patient 4's file maintained by Physician Group 1 does not include this urine drug screen.

136.     Additionally, Walgreens falsely claimed in a handwritten response to DMAS' request for additional information that Patient 4 required an exception due to a documented allergy to Ribavirin.  MD 2 did not write this note, nor did they instruct or allow Walgreens to include this information in the submission to DMAS.

137.     Patient 4's file from Physician Group 1 indicates an allergy to Phenergan, but does not document an allergy to Ribavirin.

138.     On July 16, 2015, relying on the falsified lab reports and statements, DMAS approved the prior authorization request for Patient 4.  On July 17, 2015, Walgreens communicated the approval to Physician Group 1.

139.     The false information on Patient 4's fibrosis score and metavir score on the prior authorization request was a material false statement, as were the forged fibrosis score, metavir score, urine drug screen, and allergy information on the lab reports and submissions discussed above.

140.     The claims would not have been paid absent the submission of these material false statements.

141.     Virginia Medicaid paid Walgreens a total of $32,848.95 for Harvoni 90MG-400MG tablets for Patient 4.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

    *Patient 5*

142.     Patient 5 was a Virginia Medicaid recipient who received Sovaldi 400MG tablets on July 6, 2015.  Because Patient 5 was a FFS recipient, a prior authorization was required to be submitted to Magellan prior to the prescription being reimbursed from government funds.

143.    At all times relevant to this Complaint, Patient 5 was treated for hepatitis C by NP 1 at Physician Group 1.

144.    On April 24, 2015, NP 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form.

145.    On July 1, 2015, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 5 for Sovaldi 400MG tablets.

146.    The prior authorization request attested that Patient 5 had a fibrosis score of greater than or equal to 0.59 and had abstained from the use of alcohol and illicit drugs for the required time period.  Under "Prescriber Information," the prior authorization lists NP 1 as the name of the prescriber, but the phone number listed is the phone number for Walgreens Store # 13980.

147.    The prior authorization form is purported to be signed by NP 1.  However, this signature does not match NP 1's signature on the Prescription/Pharmacy intake form and NP 1 has confirmed that they did not sign the prior authorization form.

148.    Magellan initially did not approve the prior authorization and requested additional materials, noting that the lab report supporting the fibrosis score was illegible and no urine drug screen had been submitted.

149.    In response, Walgreens submitted or caused to be submitted documentation to DMAS containing a handwritten note stating: "I attest patient is not actively abusing EtOH [alcohol] and/or drugs."  NP 1 did not write this note or sign this document, nor did they instruct or allow Walgreens to include this information in the submission to Magellan.

150.    In response to the request for additional information, Walgreens also submitted or caused to be submitted a lab report with a collection date of December 16, 2014 purportedly showing results of Patient 5's lab tests at Takoma Medical Associates.  The lab report evidences a fibrosis

score of 0.59 and a fibrosis stage of F3.  This report was falsified with Patient 5's name substituted on a report for a different, unknown individual.  A report from Synergy Laboratories for lab testing conducted on Patient 5 in August 2015 evidences a fibrosis score of 0.16 and a metavir score of F1.

151.    Based on DMAS' billing records, Takoma Medical Associates did not bill DMAS for services for Patient 5 in December 2014.

152.    Patient 5's patient file maintained by Physician Group 1 does not contain any record of any lab work being done at Takoma Medical Associates.

153.    Additionally, Walgreens submitted or caused to be submitted a lab report purporting to be results from Patient 5's urine drug screen performed at Takoma Regional Hospital with a collection date of June 2, 2015, showing negative results for all tested drugs.  On this report, Patient 5's name is substituted onto a lab report for another, unknown individual and the result for the screening for cannabis is changed to "negative."  On this report, the font for the "negative" result for the cannabis screening is different from the font for the remainder of the report.

154.    Based on DMAS' billing records, Takoma Regional Hospital did not bill DMAS for any lab any services for Patient 5 in June 2015.

155.    Patient 5's patient file maintained by Physician Group 1 does not contain any record of any lab work being done for Patient 5 at Takoma Regional Hospital.

156.    Patient 5's patient file maintained by Physician Group 1 does not contain any record of any urine drug screen having been conducted for Patient 5.

157.    On July 6, 2015, relying on the false submissions submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 5.

158.    The false information on Patient 5's fibrosis score on the prior authorization request was a material false statement, as were the forged note and lab results regarding illicit drug usage and the forged fibrosis score and fibrosis stage on the lab reports discussed above.

159.    The claim would not have been paid absent the submission of these material false statements.

160.    Virginia Medicaid paid Walgreens a total of $29,199.15 for Sovaldi 400MG tablets for Patient 5.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 6*

161.    Patient 6 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on April 14, 2016, May 10, 2016, and June 5, 2016.  Because Patient 6's coverage was provided through Virginia Premier, a prior authorization was required to be submitted to Virginia Premier prior to the prescriptions being reimbursed from government funds.

162.    At all times relevant to this Complaint, Patient 6 was treated for hepatitis C by MD 4 at Physician Group 2.

163.    On April 5, 2016, MD 4 completed Walgreens' Prescription/Pharmacy intake form for Patient 6.

164.    On April 11, 2016, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 6 for Harvoni 90MG-400MG tablets.   The prior authorization form attested that Patient 6 had a Metavir score of F3.

165.    The prior authorization form is purported to be signed by MD 4.  However, this signature does not match MD 4's signature on the Prescription/Pharmacy intake form and MD 4 has confirmed that they did not sign the prior authorization form.

166.    In support of this prior authorization request, Walgreens submitted or caused to be submitted a surgical pathology report from Highlands Pathology Consultants, P.C. that is dated March 4, 2016.  That report was falsified.  The findings of the falsified report state: "Findings compatible with chronic hepatitis C with minimal portal inflammation (grade 0-1) and rare, equivocal portal fibrosis *(stage 3)*" (emphasis added).

167.    The actual March 4, 2016 lab report from Highlands Pathology Consultants, P.C. states: "Findings compatible with chronic hepatitis C with minimal portal inflammation (grade 0-1) and rare, equivocal portal fibrosis *(stage 0-1)*" (emphasis added).

168.    Prior to April 2016, Patient 6's treating providers were skeptical that Patient 6 would qualify for Harvoni treatments because her disease progression was not severe enough.  At an office visit on September 4, 2015, the treating provider noted: "I am somewhat suspicious that [Patient 6] will not qualify for hepatitis C treatment at this point in time and we may have to wait a year or 2."

169.    On March 14, 2016, less than a month before the prior authorization was approved, Patient 6's treating provider noted: "biopsy shows *mild* inflammation and *mild fibrosis*" (emphasis added).  The provider further states: "Patient does have hepatitis C although there is *no significant damage at present*" (emphasis added).

170.    On April 14, 2016, relying on the false lab report submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 6.

171.    The false information on Patient 6's Metavir score on the prior authorization request was a material false statement, as was the false statement about the equivocal portal fibrosis stage on the lab report discussed above.

172.    The claims would not have been paid absent the submission of this material false statement.

173.    On August 15, 2016, Walgreens contacted Physician Group 2 and stated that it "need[ed] the pre treatment labs [for Patient 6] faxed to [sic] 423-224-5654."  On that same day, Physician Group 2 printed the labs and sent them to Walgreens.  As of August 2016, Walgreens had in its possession both the falsified medical records and the accurate medical records for Patient 6.

174.    Based on the accurate records in Walgreens' possession, Walgreens was aware that Patient 6 did not meet the minimum criteria for coverage and the claim would have been denied if accurate labs had been submitted.

175.    Virginia Medicaid paid Walgreens a total of $96,223.65 for Harvoni 90MG-400MG tablets for Patient 6.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

   *Patient 7*

176.    Patient 7 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on April 24, 2015 and May 22, 2015.  Because Patient 7's coverage was provided through Virginia Premier, a prior authorization was required to be submitted to Virginia Premier prior to the prescription being reimbursed from government funds.

177.    At all times relevant to this Complaint, Patient 7 was treated for hepatitis C by NP 1 at Physician Group 1.

178.    On April 17, 2015, NP 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 7.

179.    On April 21, 2015, Walgreens submitted or caused to be submitted a prior authorization request to EnvisionRX Options on behalf of Patient 7 for Harvoni 90MG-400MG tablets.

180.    The prior authorization form is purported to be signed by NP 1.  However, this signature does not match NP 1's signature on the Prescription/Pharmacy intake form and NP 1 has confirmed that they did not sign the prior authorization form.

181.   The prior authorization request contains a handwritten note that states: "Patient has a history of depression and isn't a candidate for Sovaldi/Ribavirin/Peg therapy due to previous suicide attempt."  NP 1 did not write this note, nor did they instruct or allow Walgreens to include this information on the prior authorization request.

182.   In Patient 7's patient file maintained by Physician Group 1, there is a note for Patient 7's appointment on March 18, 2015 that states that Patient 7 denies "depression, suicidal thoughts." The report from Patient 7's July 6, 2015 appointment at Physician Group 1 also indicated that she denied having depression or suicidal thoughts.

183.   In support of the prior authorization request, Walgreens submitted or caused to be submitted a lab report for a urine drug screen with a collection date of March 18, 2015 and Specimen Number of N507758497.  This reports purports to be for testing performed by Quest Diagnostics.  The lab report evidences negative results for all illicit substances included in the test.

184.   This lab report was falsified.  The header, containing Patient 7's name and other identifying information, is taken from a different lab report from Solstas Labs for Patient 7 for lab work not related to urine drug screen analysis.  The Solstas Labs header was substituted onto the results for a different, unknown individual who received urine drug screen testing at Quest Diagnostics.

185.   Quest Diagnostics has confirmed that it has no record of performing any testing with Specimen Number N507758497.

186.   Also in support of the prior authorization request for Patient 7, Walgreens submitted or caused to be submitted a falsified lab report that purports to be the results of lab work conducted on March 25, 2015 at Takoma Medical Associates.  The report contains a handwritten note that the fibrosis score is 0.67 and the stage is F3.

187.    Based on DMAS' billing records, Takoma Medical Associates never billed DMAS for treatment of Patient 7.

188.    Patient 7's patient file maintained by Physician Group 1 does not contain any record of any lab work being done for Patient 7 at Takoma Medical Associates.

189.    On April 23, 2015, relying on the false submissions submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 7.

190.    The false information regarding Patient 7's history of depression on the prior authorization request was a material false statement, as were the falsified urine drug screen, fibrosis score, and fibrosis stage on the lab reports discussed above.

191.    On August 3, 2016, a representative from Walgreens Store # 13890 emailed an employee at Physician Group 1 and requested that Physician Group 1 transmit to Walgreens documentation of a liver biopsy or fibrosis score for Patient 7.  Thus, as of at least as early as August 2016, Walgreens was aware that Patient 7 was a Virginia Medicaid recipient whose prescription for Harvoni was handled by Walgreens # 13890 and was attempting to seek accurate medical records for Patient 7.

192.    The claims would not have been paid absent the submission of these material false statements.

193.    Virginia Medicaid paid Walgreens a total of $64,149.10 for Harvoni 90MG-400MG tablets for Patient 7.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 8*

194.    Patient 8 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on May 19, 2016, June 13, 2016, and July 14, 2016.  Because Patient 8's coverage was provided

through Virginia Premier, a prior authorization was required to be submitted to Virginia Premier prior to the prescriptions being reimbursed from government funds.

195.   At all times relevant to this Complaint, Patient 8 was treated for hepatitis C by MD 3 at Physician Group 1.

196.   On March 2, 2016, MD 3 sought prior authorization for Harvoni on behalf of Patient 8.  At that time, the pharmacy requesting the prescription was CarePlus CVS Pharmacy.  The lab report that was submitted with that request, dated December 9, 2015, showed a fibrosis score of 0.19 and a metavir score of F0.

197.   On March 3, 2016 DMAS denied the prior authorization request because Patient 8 did not meet the eligibility criteria.

198.   Patient 8, through MD 3, appealed the denial both to Virginia Premier and to DMAS.  In the appeals, MD 3 acknowledged that Patient 8 did not qualify to receive Harvoni based on the metavir score requirements.  The denials were upheld and Patient 8 was not approved to receive Harvoni.

199.   On May 13, 2016, MD 3 completed Walgreens' Prescription/Pharmacy intake form for Patient 8.

200.   On May 16, 2016, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 8 for Harvoni 90MG-400MG tablets.   The prior authorization request attested that Patient 8's metavir score was F3.

201.   The prior authorization form is purported to be signed by MD 3.  However, this signature does not match MD 3's signature on the Prescription/Pharmacy intake form and MD 3 has confirmed that they did not sign the prior authorization form.

202.    In support of the prior authorization request, Walgreens submitted or caused to be submitted a falsified lab report.  The report was an alteration of the December 9, 2015 report in which the fibrosis score of 0.19 was changed to a handwritten score of 0.59 and the fibrosis stage/metavir score was changed from F0 to F3.

203.    On May 17, 2016, relying on the false fibrosis score and false fibrosis stage/metavir score submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 8.

204.    The false information on Patient 8's metavir score on the prior authorization request was a material false statement, as were the false fibrosis score and fibrosis stage/metavir score on the lab reports discussed above.

205.    The claims would not have been paid absent the submission of these material false statements.

206.    Virginia Medicaid paid Walgreens a total of $96,223.65 for Harvoni 90MG-400MG tablets for Patient 8.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

   *Patient 9*

207.    Patient 9 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on October 5, 2015.  Because Patient 9's coverage was provided through Aetna, a prior authorization was required to be submitted to Aetna prior to the prescription being reimbursed from government funds.

208.    At all times relevant to this Complaint, Patient 9 was treated for hepatitis C by MD 1 at Physician Group 1.

209.    On September 30, 2015, MD 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 9.

210.    On October 1, 2015, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 9 for Harvoni 90MG-400MG tablets.   The prior authorization request attested that Patient 9 had a metavir score of F3 or greater.

211.    The prior authorization form is purported to be signed by MD 1.  However, this signature does not match MD 1's signature on the Prescription/Pharmacy intake form and MD 1 has confirmed that they did not sign the prior authorization form.

212.    In support of the prior authorization request, Walgreens submitted or caused to be submitted a lab report purportedly from Takoma Regional Hospital with a collection date of August 27, 2015.  The report evidences a fibrosis stage of F3 and a fibrosis score of 0.65.  The report was falsified.  Patient 9's name was substituted onto the header of a lab report for a different, unknown individual.

213.    Based on DMAS' billing records, Takoma Regional Hospital never billed DMAS for services for Patient 9.

214.    Patient 9's patient file maintained by Physician Group 1 does not contain any record of any lab work being done for Patient 9 at Takoma Regional Hospital.

215.    On October 2, 2015, relying on the falsified fibrosis score and fibrosis stage submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 9.

216.    The false information on Patient 9's metavir score on the prior authorization request was a material false statement, as were the falsified fibrosis score and fibrosis stage on the lab report discussed above.

36

217.    The claim would not have been paid absent the submission of these material false statements.

218.    Virginia Medicaid paid Walgreens a total of $32,698.15 for Harvoni 90MG-400MG tablets for Patient 9.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

   *Patient 10*

219.    Patient 10 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on May 16, 2016 and June 7, 2016.  Because Patient 10 was a FFS recipient, a prior authorization was required to be submitted to Magellan prior to the prescription being reimbursed from government funds.

220.    At all times relevant to this Complaint, Patient 10 was treated for hepatitis C by NP 2 at Physician Group 1.

221.    On May 10, 2016, NP 2 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 10.

222.    On May 11, 2016, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 10 for Harvoni 90MG-400MG tablets.   That prior authorization request attested that Patient 10's fibrosis score was greater than or equal to 0.59.

223.    The prior authorization form is purported to be signed by NP 2.  However, this signature does not match NP 2's signature on the Prescription/Pharmacy intake form and NP 2 has confirmed that they did not sign the prior authorization form.

224.    In support of the prior authorization request, Walgreens submitted or caused to be submitted a lab report from Solstas Labs with a collection date of May 3, 2015 and Specimen # N612461339.  The report shows a fibrometer patient score of 0.99, a cirrhometer patient score of

0.98, and a fibrosis metavir classification of F4.  This lab report was falsified.  The tests requested, as seen in the header, are not tests that include a fibrometer patient score, a cirrhometer patient score or a fibrosis metavir classification.  This report substitutes the results of liver fibrosis testing from another, unknown individual onto the lab report with the header containing Patient 10's name and patient information.

225.    The actual lab report that corresponds to the Specimen # N612461339 does not include any results for a fibrometer patient score, a cirrhometer patient score, or a fibrosis metavir classification, but rather shows results for a different series of tests, which do match the tests requested in the header.

226.    On May 11, 2016, after reviewing the prior authorization request and supporting materials, DMAS responded that Patient 10 met the disease severity guidelines to receive Harvoni, based on the falsified lab report.  However, DMAS stated that Viekira Pak was the preferred medication given Patient 10's genotype.

227.    In response, Walgreens submitted or caused to be submitted a handwritten note stating: "patient is taking a medication for cholesterol that is contraindicated with Viekira."  NP 2 did not write this note, nor did they instruct or allow Walgreens to include this information on the response to DMAS.

228.    A review of the patient file for Patient 10 maintained by Physician Group 1 includes a list of medications Patient 10 was taking, but does not include any medications for the treatment of high cholesterol.  In fact, a lab report from February 12, 2016 shows Patient 10 had a cholesterol level that was minimally above the "desirable" range.

229.    On May 12, 2016, relying on the false fibrometer patient score, false cirrhometer patient score, and false fibrosis metavir classification, as well as the false information regarding Patient

10's medications submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 10.

230.    The false information on Patient 10's fibrosis score on the prior authorization request was a material false statement, as were the false information on Patient 10's medications and the false fibrometer patient score, false cirrhometer patient score, and false fibrosis metavir classification on the lab report discussed above.

231.    The claims would not have been paid absent the submission of these material false statements.

232.    Virginia Medicaid paid Walgreens a total of $65,703.90 for Harvoni 90MG-400MG tablets for Patient 10.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 11*

233.    Patient 11 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on February 19, 2015.  Because Patient 11's coverage was provided through Aetna, a prior authorization was required to be submitted to Aetna prior to the prescription being reimbursed from government funds.

234.    At all times relevant to this Complaint, Patient 11 was treated for hepatitis C by NP 1 at Physician Group 1.

235.    On January 29, 2015, NP 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 11.

236.    On January 29, 2015, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 11 for Harvoni 90MG-400MG tablets.  That prior authorization attested that Patient 11's metavir score was F3 or greater.

237.   The prior authorization request form is purported to be signed by NP 1.  However, this signature does not match NP 1's signature on the Prescription/Pharmacy intake form and NP 1 has confirmed that they did not sign the prior authorization form.

238.   In support of that prior authorization request, Walgreens submitted or caused to be submitted a lab report from Watauga Pathology Associates and Takoma Regional Hospital of a liver biopsy.  The report contains a handwritten star next to a diagnosis report of cirrhosis (stage 4 of 4).  The report also contains the handwritten initials "AR."  This report was falsified.  Patient 11's name is substituted onto the report for a different, unknown individual, which can be seen in the fact that the patient name and date of birth are in a font and size that does not match the rest of the report.

239.   Based on DMAS' billing records, neither Watauga Pathology Associates nor Takoma Regional Hospital billed DMAS for services for Patient 11 at any time.

240.   Patient 11's patient file maintained by Physician Group 1 does not contain any record of any testing being done by Watauga Pathology Associates or Takoma Regional Hospital.

241.   Relying on the false lab reports regarding disease severity submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 11.

242.   The false information on Patient 11's metavir score on the prior authorization request was a material false statement, as was the falsified lab report.

243.   The claim would not have been paid absent the submission of these material false statements.

244.   Virginia Medicaid paid Walgreens a total of $32,698.15 for Harvoni 90MG-400MG tablets for Patient 11.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

*Patient 12*

245.    Patient 12 was a Virginia Medicaid recipient who received Harvoni 90MG-400MG tablets on January 27, 2016, February 22, 2016, and March 17, 2016.  Because Patient 12 was a FFS recipient, a prior authorization was required to be submitted to Magellan prior to the prescription being reimbursed from government funds.

246.    At all times relevant to this Complaint, Patient 12 was treated for hepatitis C by NP 3 at Physician Group 1.

247.    On January 21, 2016, NP 3 at Physician Group 1 completed or caused to be completed Walgreens' Prescription/Pharmacy intake form for Patient 12.

248.    On January 22, 2016, Walgreens submitted or caused to be submitted a prior authorization request to DMAS on behalf of Patient 12 for Harvoni 90MG-400MG tablets.   The prior authorization request attested that Patient 12 had been screened for drug and alcohol use.

249.    The prior authorization form is purported to be signed by NP 3.  However, this signature does not match NP 3's signature on the Prescription/Pharmacy intake form and NP 3 has confirmed that they did not sign the prior authorization form.

250.    In support of the prior authorization request, Walgreens submitted or caused to be submitted a urine drug screen performed at Quest Diagnostics on the letterhead of Morristown Gastroenterology, P.C.  The report has a collection date of December 2015.  The report notes "No Drugs Detected."  This report was falsified.  Patient 12's name and date of birth have been substituted onto the urine drug screen for another, unknown individual.

251.    Quest Diagnostics has confirmed that they have no record of this urine drug screen for Patient 12.

252.    Based on DMAS' billing records, neither Quest Diagnostics nor Morristown Gastroenterology, P.C. billed DMAS for lab work for Patient 12 in December 2015.

253.    Patient 12's patient file maintained by Physician Group 1 does not contain any record of any lab work being done for Patient 12 at Quest Diagnostics or Morristown Gastroenterology, P.C.

254.    On January 24, 2016, DMAS responded to the prior authorization request, indicating that they needed additional information. Specifically, DMAS asked whether Patient 12 could use the preferred alternative, Viekira Pak. In response, Walgreens submitted or caused to be submitted a handwritten note stating that the patient has a documented allergy to ritonavir, which Patient 12 used as part of HIV prophylaxis, and Patient 12 had an anaphylactic reaction to ritonavir, so Patient 12 was not able to use Viekira Pak. NP 3 did not write this note, nor did they instruct or allow Walgreens to include this information on the submission to DMAS.

255.    Patient 12's patient file maintained by Physician Group 1, which includes Patient 12's history of medical conditions, does not indicate that Patient 12 was ever treated for HIV.

256.    A lab report dated January 7, 2016 includes results for Patient 12 from a HIV 1/2 Ag/Ab test and shows a nonreactive result.

257.    On January 25, 2016, relying on the false statement submitted or caused to be submitted by Walgreens, DMAS approved the prior authorization request for Patient 12. On January 26, 2016, Walgreens informed Physician Group 1 of the approval.

258.    The false information on Patient 12's drug and alcohol use on the prior authorization request was a material false statement, as were the falsified urine drug screen and false information regarding Patient 12's allergies.

259.    The claims would not have been paid absent the submission of these material false statements.

260.    Virginia Medicaid paid Walgreens a total of $98,555.85 for Harvoni 90MG-400MG tablets for Patient 12.  To date, Walgreens has not repaid Virginia Medicaid for any amount of this false claim.

### D.  Walgreens' False Retention of Payments Made by DMAS Based On Fraudulent Submissions

261.    Upon information and belief, Walgreens took steps to identify the payments that were made to Walgreens from Virginia Medicaid as a result of Reilly's submissions of false claims as early as June 2016.

262.    Beginning in June and July 2016, just weeks after Reilly's employment was terminated, Walgreens initiated an internal process that identified payments for Virginia Medicaid recipients that were impacted by Walgreens' fraudulent submissions.

263.    Upon information and belief, the internal investigation included obtaining patient records from health care providers for the relevant Virginia Medicaid recipients.

264.    On July 26, 2016, a representative from Walgreens Store # 13980 emailed an employee of Physician Group 1, seeking to obtain Physician Group 1's records regarding the fibrosis scores or liver biopsy results for Virginia Medicaid recipients treated by Physician Group 1.  Upon information and belief, Walgreens sought materials for these Virginia Medicaid recipients and obtained accurate information related to the records maintained by Physician Group 1.

265.    On November 7, 2018, the Commonwealth issued a subpoena *duces tecum* to Walgreens pursuant to §32.1-320 of the Code of Virginia ("the Virginia subpoena"), which required the production of all documents, electronic records, and communications pertaining to Virginia Medicaid recipients who obtained the Relevant Drugs from Walgreens Store # 13980 from July 1, 2013 to the present.

43

266.    Based on records produced by Walgreens pursuant to the Virginia subpoena, Walgreens had in its possession as early as August 2016 records for Virginia Medicaid recipients that documented that the recipients' metavir stages, fibrosis scores, and other qualifying criteria did not meet the criteria for prior authorization approval for the Relevant Drugs.

267.    Additionally, based on Walgreens' internal records, Walgreens conducted an internal investigation at least as early as June 2016 in which it investigated prescriptions for the Relevant Drugs that were submitted by Walgreens Store # 13980, including prescriptions reimbursed by DMAS.

268.    At least as early as June 2016, patient and prescription data for all 12 Virginia Medicaid recipients discussed above was included in documentation that was in the possession of high-level Walgreens employees at the corporate level, including Walgreens' Director of Asset Protection Solutions and Walgreens' Manager of Asset Protection Solutions, as well as Walgreens' Manager for Quality Assurance and Patient Safety and the Area Healthcare Supervisor for the region covering Virginia and Tennessee.

269.    This patient and prescription data included patient names, prescriber information, the relevant insurance plan, including information on the responsible MCO, as well as Walgreens' cost of filling the prescriptions, Walgreens' revenue from filling the prescription, and Walgreens' profit from the prescription.

270.    Upon information and belief, at no time prior to June 2017 did any representative of Walgreens contact any Virginia government employee or their agent to discuss returning funds obtained related to the fraudulent conduct.  The first contact between any representative of Walgreens and any Virginia government employee or their agent occurred in September 2017.

271.    Upon information and belief, at no time prior to the issuance of the Virginia subpoena had any representative of Walgreens contacted DMAS, including any of its contractors responsible for administering the Virginia Medicaid program, to notify them of the payments from the Virginia Medicaid program that resulted from Walgreens' fraudulent conduct.

272.    Upon information and belief, at no time prior to the filing of this complaint has Walgreens contacted DMAS, including any of its contractors responsible for administering the Virginia Medicaid program, to discuss the return of the payments from the Virginia Medicaid program that resulted from Walgreens' fraudulent conduct.

273.    To date, Walgreens has not reimbursed the Virginia Medicaid program for any amount of the funds obtained because of the fraudulent conduct.

### CLAIMS FOR RELIEF

COUNT I
False Claims Act, 31 U.S.C. §3729(a)(1)(A)
Making a False Claim

274.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 273 set out above.

275.    The FCA, 31 U.S.C. § 3729 (a)(1)(A), provides, in relevant part, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval… is liable to the Unites States Government for a civil penalty . . . as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. §3729(a)(1)(A).

276.    Walgreens presented or caused to be presented false or fraudulent claims for payment or approval to DMAS, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

277.    Walgreens is, therefore, liable to the United States for civil penalties for each claim, plus three times the amount of damages the United States sustained because of Walgreens' conduct.

COUNT II
False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
Knowingly Making or Using a False or Fraudulent Record Material to a
False or Fraudulent Claim

278.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 277 set out above.

279.    The FCA, 31 U.S.C. § 3729 *et seq*., provides in relevant part, that any person who "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim…is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461), plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(B).

280.    Walgreens knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by DMAS.

281.    Walgreens' false and/or fraudulent representations to DMAS related to patient eligibility criteria were material to DMAS' decision to pay the claims.  Thus, Walgreens knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity presented, or caused to be presented, false or fraudulent claims to the United States that were material for payment or approval.

282.    Walgreens is therefore liable to the United States for civil penalties for each claim, plus three times the amount of damages the United States sustained because of Walgreens' conduct.

## COUNT III
### False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Reverse False Claims

283.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 282 set out above.

284.    Walgreens knowingly and improperly avoided an obligation to pay money to the Government, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G), when it learned of the overpayment made by DMAS for the Relevant Drugs and failed to return the monies improperly paid for these false claims.

285.    Because of the Walgreens' acts, the United States has suffered damages and is entitled to and requests treble damages under the FCA in an amount to be determined at trial, plus a civil statutory penalty for each violation.

## COUNT IV
### Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3(A)(1) (2018)
### Making a False Claim

286.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 285 set out above.

287.    The VFATA provides, in relevant part, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . shall be liable to the Commonwealth for a civil penalty . . . plus 3 times the amount of damages sustained by the Commonwealth." VA. CODE ANN. § 8.01-216.3(A)(1) (2018).

288.    Walgreens presented or caused to be presented false or fraudulent claims for payment or approval to DMAS, with knowledge they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

289.    Walgreens is, therefore, liable to the Commonwealth for civil penalties, plus three times the amount of damages the Commonwealth sustained because of Walgreens' conduct.

COUNT V
Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3(A)(2) (2018)
Knowingly Making or Using a False or Fraudulent Record Material to a
False or Fraudulent Claim

290.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 289 set out above.

291.    The VFATA specifically provides, in relevant part, that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim shall be liable to the Commonwealth for a civil penalty as prescribed by law plus three times the amount of damages sustained by the Commonwealth.  VA. CODE ANN. § 8.01-216.3(A)(2) (2018).

292.    Walgreens knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity submitted or caused to be submitted claims to the Commonwealth, through DMAS, which were false or fraudulent.  As a result of the conduct alleged above, DMAS paid Walgreens for the false claims it submitted or caused to be submitted for payment and suffered damages.

293.    Walgreens' false and/or fraudulent representations to DMAS related to patient eligibility criteria were material to DMAS' decision to pay the claims.  Thus, Walgreens knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity presented, or caused to be presented, false or fraudulent

48

claims to the Commonwealth that were material for payment or approval in violation of VA. CODE ANN. § 8.01-216.1, *et seq*. (2018).

294. Walgreens is, therefore, liable to the Commonwealth for civil penalties plus three times the amount of actual damages the Commonwealth sustained because of Walgreens' conduct.

## COUNT VI
Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3(A)(7)(2018)
Reverse False Claim

295. The Government re-alleges and incorporates herein by reference paragraphs 1 through 294 set out above.

296. Walgreens made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the Commonwealth, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the Commonwealth.

297. Walgreens knowingly and willfully retained overpayments it received from DMAS for claims after it had identified or should have identified those claims as false.

298. Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the Commonwealth were made or done knowingly by Walgreens, as defined in VA. CODE ANN. § 8.01-216.3(A)(7) (2018).

299. Walgreens is therefore liable to the Commonwealth for civil penalties, plus three times the amount of damages the Commonwealth sustained because of Walgreens' conduct.

## COUNT VII
Virginia Medicaid Fraud Statute, VA. CODE ANN. § 32.1-312 (2018)

300. The Government re-alleges and incorporates herein by reference paragraphs 1 through 299 set out above.

301. The Virginia Medicaid Fraud Statute, as amended, provides, in relevant part:

A.      No person, agency or institution, but not including an individual medical assistance recipient of health care, on behalf of himself or others, whether under a contract or otherwise, shall obtain or attempt to obtain benefits or payments where the Commonwealth directly or indirectly provides any portion of the benefits or payments pursuant to the Plan for Medical Assistance and any amendments thereto as provided for in § 32.1-325, hereafter referred to as "medical assistance" in a greater amount than that to which entitled by:

> 1.      Knowingly and willfully making or causing to be made any false statement or false representation of material fact;
>
> 2.      Knowingly and willfully concealing or causing to be concealed any material facts; or . . .

B.      Any person, agency or institution knowingly and willfully violating any of the provisions of subsection A shall be (i) liable for repayment of any excess benefits or payments received, plus interest on the amount of the excess benefits or payments at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth and (ii) in addition to any other penalties provided by law, subject to civil penalties.  The state Attorney General may petition the circuit court in the jurisdiction of the alleged offense, to seek an order assessing civil penalties in an amount not to exceed three times the amount of such excess benefits or payments.  Such civil penalties shall not apply to any acts or omissions occurring prior to the effective date of this law.

VA. CODE ANN. § 32.1-312 (2018).

302.    Walgreens made, caused to be made, or used claims which were false or fraudulent, in that these claims sought payment for the Relevant Drugs for recipients who did not meet the eligibility criteria.   The Commonwealth, through DMAS, paid these claims.   Accordingly, Walgreens obtained, or attempted to obtain, excess payments from the Commonwealth by:

a)  knowingly and willfully making or causing to be made a false statement or false representation of material fact relating to the provision of prescription drugs; or,

b)  knowingly and willfully concealing or causing to be concealed material facts regarding the provision of prescription drugs.

50

303.   But for Walgreens' actions as alleged above, DMAS would not have paid Walgreens. Thus, the creation, use, and submission of the false claims were material to the Commonwealth's decision to pay Walgreens.

304.   Accordingly, Walgreens is liable to the Commonwealth for repayment of any excess benefits or payments received, plus interest on the amount of the excess benefits or payments at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth and, in addition to any other penalties provided by law, civil penalties in an amount not to exceed three times the amount of such excess benefits or payments.

COUNT VIII
Unjust Enrichment

305.   The Government re-alleges and incorporates herein by reference paragraphs 1 through 304 set out above.

306.   Walgreens submitted prior authorizations to DMAS for prescription drugs the recipients were not qualified to receive.  DMAS thereafter paid Walgreens based on Walgreens' submission of those false or fraudulent claims.

307.   Walgreens knew that DMAS paid these claims.

308.   Walgreens accepted and retained payments for these false claims, rendering it inequitable for Walgreens to retain those payments without returning the value.  By receiving and retaining funds to which it was not entitled, Walgreens was unjustly enriched and the Government deprived of its property.

309.   The Commonwealth funds its Medicaid Program under a matching grant in which a portion of the money lost as a result of Walgreens' fraudulent conduct alleged herein is federal funds, and

a portion of the money lost as a result of Walgreens' conduct alleged herein is the Commonwealth's funds.

310.    Walgreens was unjustly enriched, at the expense of the Government, in such amounts as determined at trial.

COUNT IX
Payment by Mistake

311.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 310 set out above.

312.    DMAS made payments to Walgreens based upon the belief that Walgreens was properly entitled to receive those payments.   DMAS based this belief upon representations made by Walgreens that it was entitled to receive those payments.   Walgreens received and retained the benefit of those payments and it was not entitled to receive those payments.

313.    DMAS's belief that Walgreens was entitled to these payments was mistaken and erroneous because Walgreens did not comply with the applicable statutes and regulations.

314.    Due to these payments by mistake, Walgreens has received monies to which it was not entitled.

315.    The Commonwealth funds its Medicaid Program under a matching grant in which a portion of the money lost as a result of Walgreens' fraudulent conduct alleged herein is federal funds, and a portion of the money lost as a result of Walgreens' conduct alleged herein is the Commonwealth's funds.

316.    The Government is entitled to recover those funds wrongfully, erroneously, or illegally paid to Walgreens.

317.    Walgreens' actions caused the Government to be damaged in a substantial amount to be determined at trial.

COUNT X
COMMON LAW FRAUD

318.    The Government re-alleges and incorporates herein by reference paragraphs 1 through 317 set out above.

319.    Walgreens submitted or caused to be submitted prior authorization forms, which also included supporting medical documentation, to the Commonwealth through DMAS.  DMAS thereafter paid Walgreens based on Walgreens' submission of such prior authorizations and documentation.

320.    Walgreens knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity submitted or caused to be submitted claims to the Commonwealth that were false and/or fraudulent, in that these claims were based on forged prior authorization forms and medical records.

321.    Walgreens made or caused to be made false representations of material facts intentionally and knowingly with the intent to mislead the Commonwealth regarding Walgreens' submission of prior authorization forms and medical documentation.

322.    Walgreens intended that the Commonwealth rely upon these material representations.

323.    The Commonwealth reasonably relied upon Walgreens' fraudulent misrepresentations.  As a result, the Commonwealth paid for claims that it otherwise would not have paid but for Walgreens' fraudulent statements.

324.    The Commonwealth funds its Medicaid Program under a matching grant in which a portion of the money lost as a result of Walgreens' fraudulent conduct alleged herein is federal funds, and a portion of the money lost as a result of Walgreens' fraudulent conduct alleged herein is the Commonwealth's funds.

325.     Due to Walgreens' fraudulent conduct alleged above, Walgreens is liable to the United States and the Commonwealth for compensatory and punitive damages.

PRAYER FOR RELIEF

WHEREFORE, the United States and the Commonwealth respectfully pray:

326.     That the acts alleged herein be adjudged and decreed to be unlawful in violation of the False Claims Act, the Virginia Fraud Against Taxpayers Act, and the Virginia Medicaid Fraud Statute;

327.     That the Government recover three-fold the damages determined to have been sustained by them pursuant to 31 U.S.C. § 3729(a) (2018) and VA. CODE ANN. § 8.01-216.3 (2018), and that judgment be entered against Defendant in favor of the Government;

328.     That the Government recover costs pursuant to 31 U.S.C. § 3729(a)(3) and VA. CODE ANN. § 8.01-216.3(A);

329.     That Walgreens be ordered to pay civil penalties pursuant to 31 U.S.C. § 3729(a) and VA. CODE ANN. § 8.01-216.3(A) for each false claim filed;

330.     That Walgreens be ordered to pay the amount of excess payments made by the Commonwealth as a result of Walgreens' violation of the Virginia Medicaid Fraud Statute plus interest at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth pursuant to VA. CODE ANN. § 32.1-312(B) (2018).

331.     That Walgreens be ordered, in addition to any other penalties provided by law, to pay civil penalties pursuant to VA. CODE ANN. § 32.1-312(B), for up to three times the amount of excess

payments made by the Commonwealth as a result of Walgreens' violations of the Virginia Fraud Statute;

332.    That the Walgreens be ordered to pay compensatory damages equal to the amount of excess payments made by the Commonwealth as a result of Walgreens' actions plus punitive damages as deemed appropriate by the Court;

333.    That Walgreens be ordered to return, on equitable grounds, the amount of the fraudulently obtained payments to the Commonwealth and the United States.

334.    That the Government be granted such other and further relief as the Court deems just, equitable, and proper.

DATED: June 22, 2021

Respectfully submitted,

DANIEL P. BUBAR
ACTING UNITED STATES ATTORNEY

By:      /s/ *Justin M. Lugar*
JUSTIN LUGAR (VSB #77007)
Assistant United States Attorney
310 First Street, SW
Room 906
Roanoke, VA 24011
Tel: (540) 278-1471
Fax: (540) 857-2614
Email: Justin.Lugar@usdoj.gov
*Counsel for the United States*

COMMONWEALTH OF VIRGINIA

By:      /s/ *William Clay Garrett*
WM. CLAY GARRETT (VSB #46881)
CAITLYN HUFFSTUTTER (VSB #83776)
Assistant Attorneys General
Virginia Office of the Attorney General
Medicaid Fraud Control Unit, Civil Litigation
202 North 9th Street

Richmond, VA 23219
Tel: (804) 371-6016
Tel: (804) 371-2146
Fax: (804) 786-0807
Email: wgarrett@oag.state.va.us
Email: chuffstutter@oag.state.va.us
*Counsel for the Commonwealth*