## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ET AL.,** | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:21CV00032 |
| v. | ) ) | **OPINION AND ORDER** |
| **WALGREEN CO.,** | ) ) | JUDGE JAMES P. JONES |
| Defendant. | ) ) | |

*Justin Lugar, Assistant United States Attorney, Roanoke, Virginia, for Plaintiff United States of America; Wm. Clay Garrett and Caitlyn Huffstutter, Assistant Attorneys General, VIRGINIA OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Plaintiff Commonwealth of Virginia; Michael R. Dziuban and Jonathan M. Phillips, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., and Reed Brodsky, GIBSON, DUNN & CRUTCHER LLP, New York, New York, for Defendant Walgreen Co.; Jonathan A. Henry, Jeffrey S. Bucholtz, and Jeremy M. Bylund, KING & SPALDING LLP, Washington, D.C., for Amicus Curiae Chamber of Commerce of the United States of America.*

In this civil case brought by the United States and the Commonwealth of Virginia alleging violations of the False Claims Act (FCA) as well as state law claims, defendant Walgreen Co. (Walgreens) has moved to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

The plaintiffs assert in their Complaint that from January 2015 through July 2016, Amber Reilly, a Clinical Pharmacy Manager at a Walgreens pharmacy in Kingsport, Tennessee, and another employee at her direction, changed data on forms

and falsified laboratory test results in order to obtain preauthorization for reimbursement for hepatitis C medications that Walgreens provided to Virginia Medicaid recipients.  Those who received the drugs had been diagnosed with hepatitis C and had been prescribed the medications by their respective healthcare providers.  They generally did not, however, meet certain disease severity and alcohol and drug abstinence requirements that Virginia Medicaid had adopted as prerequisites for reimbursement.  These preauthorization requirements were in place because the drugs were expensive considering Virginia Medicaid's limited budget.  The claims at issue would not have been paid by Virginia Medicaid had Reilly not submitted, or directed the submission of, falsified documents.  Walgreens has not reimbursed Virginia Medicaid for any of the nearly $800,000 paid to Walgreens based on its employees' false representations.

I initially granted the Motion to Dismiss based on lack of materiality, holding, in essence, that the relevant Virginia Medicaid eligibility requirements were inconsistent with federal Medicaid rules and that, to the extent that the misrepresentations involved the invalid state requirements, they could not be materially false, since the claims should have been paid without the false statements. *United States v. Walgreen Co.*, No. 1:21CV00032, 2021 WL 5760307, at *10–12 (W.D. Va. Dec. 3, 2021).  On the plaintiffs' appeal, the court of appeals reversed, holding that the alleged misrepresentations were material because the defendant

could not "escape liability by arguing that [its] fraudulent statements went to illegal requirements."   *United States v. Walgreen Co.*, 78 F.4th 87, 95 (4th Cir. 2023) (citing *United States v. Kapp*, 302 U.S. 214, 218 (1937)).   The court of appeals explained that even if the state eligibility requirements were in violation of federal law, they plausibly "'had a natural tendency to influence, or [were] capable of influencing,' the government decisionmakers." 78 F.4th at 93 (quoting 31 U.S.C. § 3729(b)(4).[1]  The court of appeals did not express an opinion as to the other grounds of the Motion to Dismiss not considered by this court and remanded the case for resolution of the remaining issues.  *Id.* at 97.

After consideration of the record and the parties' arguments, I will now deny Walgreens' Motion to Dismiss.

## I.

The following facts are alleged in the plaintiffs' 56-page Complaint, which I must accept as true for purposes of deciding Walgreens' Motion to Dismiss.

The United States, through its Department of Health and Human Services (HHS), administers grants to states for Medical Assistance Programs, commonly

---

[1]  The court of appeals noted that the illegality of the state requirements "might be relevant to whether the misrepresentations had a natural tendency to influence, or could influence, the decisionmakers," but were not dispositive of materiality.  *Id.*  The court also pointed out that one of the 12 fraudulent claims cited in the Complaint did not involve eligibility under the targeted state requirements and thus was erroneously dismissed on the materiality ground.  *Id.* at 94–95.

known as Medicaid, pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396w-6. The Virginia Department of Medical Assistance Services (DMAS) administers the Virginia Medicaid program, which is a jointly funded federal and state program. Like all participating states, Virginia submitted to HHS a plan for administering its Medicaid program, which explained how the state would meet applicable federal rules and regulations.

Walgreens owns and operates more than 9,000 pharmacies throughout the United States. Walgreens was a registered Virginia Medicaid provider during the relevant time period. The Walgreens Specialty Pharmacy, located at Holston Valley Medical Center in Kingsport, Tennessee, where employee Amber Reilly worked, billed DMAS for prescription drugs and other services.

DMAS contracted with Magellan Medicaid Administration (Magellan) to administer the claims submitted for its fee-for-service (FFS) program. Magellan's duties included determining whether patients satisfied DMAS coverage eligibility criteria for expensive prescription drugs. DMAS directly reimburses providers, such as Walgreens, for services provided to its FFS recipients.

DMAS also contracts with Managed Care Organizations (MCOs) to provide prescription drugs and other services to Virginia Medicaid recipients. The MCOs determined whether patients met DMAS's criteria for coverage of relevant drugs.

Both FFS claims and managed care plan claims were paid with funds provided by the Commonwealth of Virginia and HHS.

To participate in Virginia Medicaid, providers like Walgreens must execute a participation agreement in which they agree to adhere to the policies and regulations set forth in DMAS Provider Manuals, including documentation requirements and billing rules, and to comply with applicable state and federal laws. The Walgreens store at which Reilly worked entered into such a participation agreement on October 21, 2010.

During the relevant time period, DMAS required prior authorization for certain prescription drugs. A prescribing practitioner was required to complete a prior authorization form for an individual patient. The form asked a number of detailed questions about the patient's medical history, and the provider had to submit laboratory reports and drug test results supporting the answers to the questions. DMAS reviewed this information to determine whether the patient met eligibility criteria in order for the claim to be paid and notified the prescriber of its decision. Prior authorization was required for certain drugs used to treat hepatitis C, namely Sovaldi 400 MG tablets, Harvoni 90 MG-400 MG tablets, and Daklinza 60 MG tablets (collectively, the "relevant drugs"). Absent prior approval for the relevant drugs, claims for them would be denied. A full course of treatment with one of the relevant drugs could cost DMAS as much as $96,000.

During the relevant time period, claims based on the relevant drugs were reimbursable for patients whose fibrosis stage (also called metavir stage) was F3 or F4, but not those whose stage was F0, F1, or F2. The claims were reimbursable for patients who had fibrosis scores of greater than or equal to 0.59. The metavir stages and fibrosis scores were indicators of liver damage caused by hepatitis C. The claims for the relevant drugs were also reimbursable for patients who had documented cirrhosis. The claims were reimbursable only for patients who had not used drugs or alcohol in the prior six months, as confirmed by urine drug screen results or physician certification.

Reilly sometimes held herself out to be a "patient care advisor" with Physician Group 1 when submitting documentation to DMAS, Compl. ¶ 51, ECF No. 1, but she was not employed by Physician Group 1; she was only employed by Walgreens. Reilly was not authorized to sign the name of any employee of Physician Group 1 on documentation submitted to DMAS. Reilly approached a nurse practitioner at Physician Group 1 ("NP 1") and offered to complete the insurance paperwork for the practice's hepatitis C patients if Physician Group 1 filled the prescriptions through Reilly's Walgreens store. NP 1 agreed but did not give Reilly authority to sign her name or to write appeal letters on NP 1's behalf without NP 1 first reviewing the letter.

The revenue of Reilly's Walgreens store was $1,589,528 in February 2015, the first month in which Walgreens received payment based on falsified documentation submitted by Reilly or at her direction.  In May 2016, the store's revenue was $5,098,765.  The store's revenue increased by more than 320% in just 15 months.  "This staggering revenue increase resulted from dramatic increases in revenues from payments by government payors, including DMAS, for hepatitis C drugs."  *Id*. ¶ 55.

During a performance review for the year ending August 31, 2015, Reilly told her manager, Charles Wykes, "I know what each payor requires for approval, [. . .] and I've became [sic] an expert in customizing appeal letters based on a plan's criteria.  This knowledge has been crucial in receiving approvals, which in return, has increased profits and strengthened relationships with providers."  *Id*. ¶ 56.  Wykes stated, "[Reilly] has not only created loyal customers, but has created very loyal Dr offices and case managers and has developed our site to have a reputation of one that will go the extra mile.  She [. . .] must present in a way that gains trust because I have witnessed her detail one day and the next gain several referrals from the office."  *Id.*

By June 2016, Walgreens "was on notice that it had received payments based on false statements and documents submitted or caused to be submitted and that it had an obligation to reimburse DMAS for such overpayments."  *Id.* ¶ 57.  That

month, state law enforcement served Walgreens with subpoenas seeking records related to prescriptions filled for certain patients. On June 15, 2016, Walgreens' loss prevention personnel went to Reilly's store to investigate, and they obtained records that had been altered. An employee admitted to loss prevention personnel that she had falsified prior authorization records at Reilly's direction.

In October 2016, Reilly pled guilty in the United States District Court for the Eastern District of Tennessee to the crime of health care fraud, 18 U.S.C. § 1347. She admitted that she had falsified, and directed another employee to falsify, prior authorization paperwork, laboratory reports, and drug test results to secure coverage for the relevant drugs for patients who did not satisfy state eligibility criteria.

DMAS's Pharmacy Manual requires providers to "refund payments made by Medicaid if they are found to have billed Medicaid contrary to law or regulation, failed to maintain any record or adequate documentation to support their claims, or billed for medically unnecessary services." *Id.* ¶ 64 (quoting DMAS Pharmacy Policy Manual, Chapter VI at 2 (last updated Dec. 16, 2015)). Walgreens has not refunded any payments to DMAS that were made based upon falsified documentation. Falsified preauthorization documents were submitted to DMAS for at least twelve patients, and Virginia Medicaid paid Walgreens at least $793,908.95 for drugs that the patients were not then eligible to receive under Virginia Medicaid's prior authorization criteria.

The Complaint alleges that, "[u]pon information and belief, Walgreens took steps to identify the payments that were made to Walgreens from Virginia Medicaid as a result of Reilly's submissions of false claims as early as June 2016." *Id.* ¶ 261. Walgreens began an "internal process" in June and July 2016, weeks after Reilly was terminated, "that identified payments for Virginia Medicaid recipients that were impacted by Walgreens' fraudulent submissions." *Id.* ¶ 262. "Upon information and belief, the internal investigation included obtaining patient records from health care providers for the relevant Virginia Medicaid recipients." *Id.* ¶ 263. "On July 26, 2016, a representative from [Reilly's Walgreens store] emailed an employee of Physician Group 1, seeking to obtain Physician Group 1's records regarding the fibrosis scores or liver biopsy results for Virginia Medicaid recipients treated by Physician Group 1." *Id.* ¶ 264. The plaintiffs allege, "[u]pon information and belief," that Walgreens "obtained accurate information" for these patients. *Id.*

Virginia issued a subpoena to Walgreens requiring the production of all documents, records, and communications relating to Virginia Medicaid recipients who received the relevant drugs from Reilly's Walgreens location beginning on July 1, 2013. The records Walgreens produced in response show that Walgreens had accurate records for Patients 1 through 12 in its possession by August 2016 which indicated that these patients did not meet the Virginia Medicaid eligibility criteria for the relevant drugs. Walgreens' internal records also show that as early as June

2016, it initiated an investigation into prescriptions for the relevant drugs filled by Reilly's store. By June 2016, high-level Walgreens employees — including the Director of Asset Protection Solutions, Manager of Asset Protection Solutions, Manager for Quality Assurance and Patient Safety, and Area Healthcare Supervisor for the region — possessed patient and prescription data for Patients 1 through 12. This information "included patient names, prescriber information, the relevant insurance plan, including information on the responsible MCO, as well as Walgreens' cost of filling the prescriptions, Walgreens' revenue from filling the prescription, and Walgreens' profit from the prescription." *Id.* ¶ 269.

The Complaint alleges, "[u]pon information and belief," that no one from Walgreens contacted anyone with the Virginia government to discuss returning the fraudulently obtained funds before June 2017 and that the first contact between Walgreens and a Virginia government representative occurred in September 2017. *Id.* ¶270. The Complaint further alleges that, "[u]pon information and belief," Walgreens has never contacted DMAS or its contractors to discuss returning the payments. *Id.* ¶ 271.

Based on these facts, the Complaint asserts ten claims against Walgreens: Making a False Claim in violation of the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)(A) (Count I); Knowingly Making or Using a False or Fraudulent Record Material to a False or Fraudulent Claim in violation of the FCA, 31 U.S.C.

§ 3729(a)(1)(B) (Count II); Reverse False Claims in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) (Count III); Making a False Claim in violation of the Virginia Fraud Against Taxpayers Act (VFATA), Va. Code Ann. § 8.01-216.3(A)(1) (Supp. 2021) (Count IV); Knowingly Making or Using a False or Fraudulent Record Material to a False or Fraudulent Claim in violation of VFATA, Va. Code Ann. § 8.01-216.3(A)(2) (Supp. 2021) (Count V); Reverse False Claim in violation of VFATA, Va. Code Ann. § 8.01-216.3(A)(8) (Supp. 2021)[2] (Count VI); violation of the Virginia Medicaid Fraud Statute, Va. Code Ann. § 32.1-312 (2018) (Count VII); Unjust Enrichment (Count VIII); Payment by Mistake (Count IX); and Common Law Fraud (Count X).

Subject-matter jurisdiction of this court is based on 28 U.S.C. §§ 1331 and 1345 for the counts of the Complaint under the FCA, and over the state law claims as permitted by 28 U.S.C. § 1367(a).[3]

II.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim, but

---

[2] The Complaint cites section 8.01-216.3(A)(7) but should instead cite section 8.01-216.3(A)(8), containing the reverse false claims provision of VFATA.

[3] I will decide the state law claims because they "arise out of the same interrelated series of events or transactions and derive from a common nucleus of operative facts." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 n.1 (4th Cir. 2007) (internal quotation marks and citation omitted).

"importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in a complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To survive a motion to dismiss, a complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Claims brought under the FCA and other anti-fraud statutes must be pled with the heightened particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015). To satisfy Rule 9(b), a plaintiff must plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted). However, fraudulent "intent . . . may be alleged generally." Fed. R. Civ. P. 9(b). A fraud claim likely passes muster under Rule 9(b) "if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial,

-12-

and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

### A. *Counts I and II — Direct FCA Claims.*

Count I asserts a claim of Making a False Claim under the FCA, 31 U.S.C. § 3729(a)(1)(A). That subsection makes liable a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *Id.* "Knowingly" is defined to mean that the person making the fraudulent claim "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "[N]o proof of specific intent to defraud" need be shown. 31 U.S.C. § 3729(b)(1)(B).

Count II is a claim of Knowingly Making or Using a False or Fraudulent Record Material to a False or Fraudulent Claim in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B). That subsection of the FCA makes liable a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* In their briefs, the parties do not distinguish between Counts I and II; they refer to both as direct FCA claims and appear to argue the same points as to both counts.

A person can be held liable under the FCA only for a false statement that is material, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S.

176, 192 (2016), which is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4). In obeyance to the Fourth Circuit's holding in this case, the I find that the plaintiffs have plausibly alleged a materially false representation.

An entity or person can only be held liable under the FCA where that entity had the requisite scienter. This means that the party must have had "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Congress' drafting of the FCA to include a knowledge element indicates that the act was not designed to "punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (internal quotation marks and citations omitted).

Walgreens contends that respondeat superior does not apply in direct FCA claims, and thus it cannot be liable under Counts I and II for the fraudulent conduct of Reilly and her accomplice since it is not plausibly alleged that Walgreens itself did not act in good faith, citing *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), a Title VII case.

At about the same time as the plaintiffs filed this case in this court, the United States and the State of Tennessee filed a similar case in the United States District Court for the Eastern District of Tennessee, alleging that Walgreens was liable under

the FCA and Tennessee law for the fraud scheme led by employee Reilly resulting in loss to Tennessee's Medicaid program (TennCare).   As in the present case, Walgreens filed a Motion to Dismiss, which the district court denied in a comprehensive opinion. *United States v. Walgreen Co.,* 591 F. Supp. 3d 297 (E.D. Tenn. 2022).[4]

As here, Walgreens argued in the Tennessee case that *Kolstad* teaches that punitive liability cannot be imposed on a vicarious basis unless it can be shown that the company itself shared it's employee's scienter by recklessly disregarding the falsity of the information provided to the government.   The Tennessee district court rejected that argument, holding that the restitutional purposes of the FCA require that the employer-principal receiving the funds obtained by the fraud be held liable. *Id*. at 304–12.   Thus, the knowledge of an employee in FCA cases can be imputed to the employer when the employee acts for the employer's benefit and within the scope of the employment.   While the Tennessee district court's reasoning is not binding on this court, I find it persuasive.

Walgreens argues that it had good faith reasons to believe that the store's revenues had increased for proper reasons, as the Complaint itself acknowledges

---

[4] While in the Tennessee case Walgreens pleaded the defense that the misrepresentations were not material, Amended Answer at 28, *United States v. Walgreen Co.,* No. 2:21-cv-00080-JRG-CRW (E.D. Tenn. May 2, 2022), ECF No. 115, it apparently did not argue that defense in support of its Motion to Dismiss.  The Tennessee case was eventually settled.  *Id*. at ECF No. 205.

with Reilly's supervisor's statements regarding her ability to create customer loyalty and trust.  However, merely arguing good faith reasons is insufficient to defeat allegations concerning Walgreens' scienter at the motion to dismiss stage.   Several allegations of the Complaint demonstrate the plausibility of Walgreens' scienter, even apart from reliance upon a theory of vicarious liability.  For example, Walgreens had notice of the large increase in store revenue.  The revenue increased from $1,589,528 in February 2015 (when Walgreens was first paid by DMAS for a materially false claim) to $5,098,765 in May 2016, an increase of over $3,500,000 and 320%.  Indeed, the increase in sales was a topic of the conversation with Reilly's supervisor — the event that prompted Reilly to provide her reasons for the store's increased revenues.   Moreover, Walgreens employed a bonus program that incentivized higher sales.  Though this incentive may be reasonable from a business perspective, Walgreens would have awareness of the possible downside of such a program — namely, the incentive to increase revenue numbers by any means necessary.  The substantial increase in revenue, in combination with Walgreens' awareness of that increase and potential causes, may support a finding of scienter. *United States ex rel. Shutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023) ("[T]he term 'actual knowledge' [under the FCA] refers to whether a person is 'aware of'

information.").  I will not resolve factual questions at this stage, and the Motion to Dismiss must be denied as to Counts I and II.[5]

### B.   Counts IV and V — Direct VFATA Claims.

Count IV asserts a claim under VFATA for making a false claim in violation of Va. Code Ann. § 8.01-216.3(A)(1) (Supp. 2021).  This subsection of the Virginia statute makes liable a person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  *Id.*  Count V is a claim of knowingly making or using a false or fraudulent record material to a false or fraudulent claim, in violation of VFATA, Va. Code Ann. § 8.01-216.3(A)(2) (Supp. 2021).  This subsection of VFATA makes liable a person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *Id.*

These claims are essentially the same as Counts I and II, and the parties make the same arguments here.  VFATA's requirements are virtually identical to those of the FCA.  The plaintiffs' VFATA claims survive for the same reasons as their direct FCA claims.

---

[5]   Walgreens also argues that vicarious liability is not appropriate in this case because Reilly was not a high-level employee.  But to the extent that factual defense may be relevant, it is not suitable for resolution now.

### C. *Counts III and VI — Reverse False Claims (FCA and VFATA).*

Count III alleges a reverse false claims theory under the FCA, 31 U.S.C. § 3729(a)(1)(G). That subsection, in relevant part, makes liable a person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* "[T]he term 'knowingly' must be interpreted to refer to a defendant's awareness of *both* an obligation to the United States *and* his violation of that obligation." *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436 (6th Cir. 2016).

The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The Patient Protection and Affordable Care Act ("PPACA") defines a Medicaid overpayment as "any funds that a person receives or retains under [the Medicaid statutes] to which the person, after applicable reconciliation, is not entitled under [the Medicaid statutes]." 42 U.S.C. § 1320a-7k(d)(4)(B). PPACA requires a recipient to return an overpayment within 60 days of when it is identified; if the overpayment is not timely returned, an obligation arises under the FCA. 42 U.S.C. § 1320a-7k(2), (3). At least one court has held that an overpayment is identified "when a provider is put on notice

of a potential overpayment." *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp 3d 370, 388 (S.D.N.Y. 2015). The same court held that "the plain meaning of 'avoid' includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing." *Id.* at 394.

Walgreens argues it did not improperly avoid repaying the government, and had no obligation to repay the funds, because there was a good faith dispute over whether Virginia Medicaid's prior authorization criteria were lawful.

The Chamber of Commerce of the United States of America ("Chamber") has filed an amicus brief in support of Walgreens' position in which it argues that the plaintiffs essentially seek to turn the reverse FCA provision into a strict liability statute. The Chamber contends that the Complaint's allegations are inadequate as to Count III because it does not allege that either Walgreens itself or any administrative or judicial body ever determined that Walgreens had in fact received an overpayment. According to the Chamber,

> As pleaded, the government's theory amounts to the assertion that if the government tells a company that *the government believes* it is owed money, the company is required to take the government's word for it and immediately meet the government's payment demand or face crushing treble damages and penalties for violating the False Claims Act.

Amicus Br. 2, ECF No. 23.

As to the reverse false claim counts, the plaintiffs must plead that (1) Walgreens had an obligation to repay the government, (2) it improperly avoided

repaying the funds, and (3) it did so knowingly. *Muskingum Watershed Conservancy Dist.*, 842 F.3d at 436. The alleged obligation is based on failure to return a Medicaid overpayment within 60 days of identification, as set forth in the PPACA. As discussed in Part II.A, supra, the plaintiffs have asserted a plausible claim for relief.

Count VI asserts a theory of Reverse False Claims under VFATA, Va. Code Ann. § 8.01-216.3(A)(8) (Supp. 2021). This subsection renders liable a person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth." *Id.*

The parties' arguments with respect to Count VI are the same as those with respect to Count III, the reverse false claim count under the FCA. Count VI, therefore, will also survive the Motion to Dismiss.

### D. Count VII.

In Count VII, the plaintiffs contend that Walgreens violated the Virginia Medicaid Fraud Statute, Va. Code Ann. § 32.1-312 (2018). That statute states, in relevant part:

> A. No person, agency or institution, . . . shall obtain or attempt to obtain benefits or payments where the Commonwealth directly or indirectly provides any portion of the benefits or payments pursuant to the Plan for Medical Assistance and any amendments thereto as

provided for in § 32.1-325, hereafter referred to as "medical assistance" in a greater amount than that to which entitled by:

      1.  Knowingly and willfully making or causing to be made any false statement or false representation of material fact; [or]

      2.  Knowingly and willfully concealing or causing to be concealed any material facts[.]

*Id.*

As explained above, the plaintiffs have plausibly alleged at the motion to dismiss stage that Walgreens is vicariously liable.

### E.  Counts VIII and IX.

Count VIII is a common law unjust enrichment claim.  Under Virginia law, a party claiming unjust enrichment must allege facts showing that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant "knew of the benefit and should reasonably have expected to repay" the plaintiff; and (3) the defendant "accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008).

For the reasons explained above, the plaintiffs' allegations, taken as true, may show that Walgreens should "reasonably have expected to repay" the plaintiffs.  I will therefore deny the Motion to Dismiss as to Count VIII.

Count IX is a claim of payment by mistake.  Under Virginia law, "a right of recovery . . . in the case of money paid by mistake of fact" is based on an implied promise to return the money "whenever the circumstances are such that ex æquo et

bono [or according to equity] the money should be paid back." *Hibbs v. First Nat'l Bank of Alexandria*, 112 S.E. 669, 673 (Va. 1922).   "[P]ayment or overpayment under a mistake of fact" is a form of unjust enrichment.   *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020).   Count IX is not dismissed because the plaintiffs have plausibly alleged that Walgreens received payments under mistaken facts that were attributable to the fraud of another.

### F.  Count X.

Count X is a common law fraud claim.   "Common law fraud consists of (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance thereon by the party misled, and (6) resulting damage to the party misled." *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014).   For the same reasons discussed above, Count X will survive the Motion to Dismiss.

### IV.

For the foregoing reasons, it is **ORDERED** that the Motion to Dismiss, ECF No. 8, is DENIED.

ENTER:  January 13, 2024

/s/  JAMES P. JONES
Senior United States District Judge